AUSA: Kathleen Cooperstein    Telephone: (202) 957-2958

AO 106 (Rev. 04/10) Application for a Search Warrant   Special Agent: Claudia Link    Telephone: (313) 460-2087

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>43171 DALCOMA DRIVE, SUITE 7<br>CLINTON TOWNSHIP, MICHIGAN 48038 | )<br>)<br>)<br>)<br>)<br>)    Case No. 21-mc-50200-2 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See ATTACHMENT A.

located in the _____Eastern_____ District of _____Michigan_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347, 18 U.S.C. § 1343, | Health Care Fraud, Wire Fraud, |
| 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud and Wire Fraud |

The application is based on these facts:

See attached AFFIDAVIT.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

**Claudia Link, Special Agent**
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _____September 14, 2021_____

*Judge's signature*

City and state: __Detroit, Michigan__

David R. Grand    U. S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>LIFE TRANSITION SERVICES, LLC<br>43171 DALCOMA DRIVE, SUITE 7,<br>CLINTON TOWNSHIP, MICHIGAN 48038 | Case No.<br><br>**<u>Filed Under Seal</u>** |

## <u>AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT</u>

The undersigned, Claudia Link, being first duly sworn, hereby deposes and states as follows:

1.     This affidavit is submitted in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search LIFE TRANSITION SERVICES, LLC ("LTS"), located at 43171 Dalcoma Drive, Suite 7, Clinton Township, Michigan 48038 ("Subject Premises").

2.     The Subject Premises is more fully described in Attachment A, while Attachment B sets forth those documents, patient files, and other evidence and fruits and instrumentalities of criminal conduct to be seized.

## <u>AFFIANT'S BACKGROUND AND QUALIFICATIONS</u>

3.     I am a Special Agent employed by the Federal Bureau of Investigation.

I have been so employed since July 2002. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses. As part of my duties, I investigate crimes related to health care fraud.

4.      My duties and responsibilities as a Special Agent include conducting criminal investigations of individuals, organizations and businesses that have violated federal laws, including, but not limited to the following federal statutes: 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud).

5.      I have knowledge of the facts set forth in this Affidavit as a result of my participation in the investigation, as well as information provided to me by other law enforcement agents and agencies, including the U.S. Department of Health and Human Services-Office of Inspector General ("HHS-OIG"). Information pertinent to this investigation was also provided by CoventBridge (formerly known as AdvanceMed), the current zone program integrity contractor for Michigan which contracts with HHS to perform investigations and audits designed to protect the Medicare program from fraud, waste, and abuse.

## INVESTIGATIVE BACKGROUND

6.      Since 2020, I have been assigned to an investigation involving LTS and David Judd ("JUDD").

7.      Based upon information obtained by HHS-OIG and the FBI, and a thorough review of Medicare claims data, there is probable cause to believe, and I do believe, that LTS submitted and caused the submission of false and fraudulent claims to Medicare for services that were not medically necessary, were not rendered, were rendered by individuals other than those indicated on the claims, and/or were rendered by someone who is not licensed to perform such services.

8.      The evidence shows that claims for various services were submitted to Medicare by LTS, which is owned by JUDD. These claims were for services purportedly rendered by JUDD, as well as Ebony Harvey-Jackson, Sandra Hembree, and Eriko Usui. The services purportedly provided by LTS include psychotherapy services and medication evaluations, mainly for adults and seniors with Medicare in group homes and assisted living facilities. LTS billed Medicare for numerous individual psychotherapy and medication evaluations that were not medically necessary, not rendered, were rendered by individuals other than those indicated on the claims, and/or who were not licensed to perform such services.

9.      Corporate records filed with the Michigan Department of Licensing and

Regulatory Affairs (LARA) show that JUDD formed LTS on September 5, 2012. The corporate records reflect the purpose of the business as "staffing services," and identified the registered office address as 21031 Sunnydale, St. Clair Shores, Michigan. The Annual Statements through 2021 all continue to list LTS's registered address as 21031 Sunnydale, St. Clair Shores, which is also JUDD's home address, according to Michigan Secretary of State records. Interviews of JUDD and former employees, and a review of Medicare forms and the LTS website indicate, however, that LTS's current practicing location is 43171 Dalcoma Road, Suite 7, Clinton Township, Michigan.

10.     Based upon my training and experience investigating health care fraud, wire fraud, and other related federal offenses, and the information set forth below, I have reason to believe, and do believe, that certain evidence and fruits and instrumentalities of violations of the following federal criminal statutes is presently being maintained or stored at the Subject Premises:

a.  Title 18, U.S.C., § 1347, Health Care Fraud;

b.  Title 18, U.S.C., § 1343, Wire Fraud; and

c.  Title 18, U.S.C., § 1349, Conspiracy to Commit Health Care Fraud and Wire Fraud.

11.     Because this Affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included each and every fact known to me concerning this investigation.

## **VIOLATION STATUTES**

12.     Title 18, United States Code, Section 1347, prohibits health care fraud: whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1)     to defraud any health care benefit program; or

(2)     to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

13.     Title 18, United States Code, Section 1343, prohibits wire fraud: whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings,

5

signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

14.     Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud or wire fraud, shall be subject to the same penalties as those proscribed in United States Code, Sections 1347 and/or 1343.

15.     Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

## THE MEDICARE PROGRAM

### Background

16.     The Medicare Program ("Medicare") is a federally funded health care program providing benefits to persons who are at least 65 years old or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within HHS. Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

17.     Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

18.     By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

19.     Medicare providers are required to maintain all records that disclose the extent of services provided and significant business transactions for at least a period of six years.

20.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).   Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

21.     CMS relies on a network of Medicare Administrative Contractors, known as MACs, to process Medicare claims, and MACs serve as the primary operational contact between the Medicare Fee-For-Service program and the

approximately 1.5 million health care providers enrolled in the program. MACs enroll health care providers in the Medicare program and educate providers on Medicare billing requirements, in addition to answering provider and beneficiary inquiries.

22.     Physicians, clinics, and other health care providers that provide services to Medicare beneficiaries under Parts A and B are able to apply for and obtain a "provider number." A health care provider who receives a Medicare provider number is able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim is required to set forth, among other things, the beneficiary's name and Medicare information number, the services performed for the beneficiary, the date that the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who ordered the services.

23.     An electronic funds transfer, or EFT, was the electronic message used by health plans to order a financial institution to electronically transfer funds to a provider's account to pay for health care services. An EFT included information such as: amount being paid, name and identification of the payer and payee, bank accounts of the payer and payee, routing numbers, and date of payment.

**Medicare Part B**

24.     Psychotherapy services and medical evaluations that are covered by Medicare Part B include, among other things, certain physician and outpatient services, including visits with physicians, physician's assistants ("PAs") and nurse practitioners ("NPs") at a physician's office or in the beneficiary's home, that are medically necessary and legitimately prescribed. Under Medicare Part B, physician visits and other related services must be medically necessary and rendered by licensed physicians or other licensed, qualified health care providers to be reimbursed by Medicare. Medicare claims for Part B services are processed and paid by MACs who contract with CMS to administer specific parts of the Medicare program in specific jurisdictions.

25.     Payments under Medicare Part B are often made directly to the provider rather than to the patient/beneficiary. For this to occur, the beneficiary would assign the right of payment to the health care provider. Once such an assignment took place, the provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare. If the provider's Medicare claim was approved, a substantial portion of the total amount of the claim was paid either by check or by wire transfer to an account designated by the provider.

**Medicare Billing/Procedure Codes**

26.    The American Medical Association assigns and publishes numeric codes, known as the Current Procedural Terminology ("CPT") and Health Care Procedure Common Coding System ("HCPCS") codes.  The codes are a systematic listing, or universal language, used to describe the procedures and services performed by health care providers.

27.    The procedures and services represented by the CPT and HCPCS codes are health care benefits, items, and services within the meaning of 18 U.S.C. § 24(b).  They include codes for office visits, diagnostic testing and evaluation, and other services. Health care providers use CPT and HCPCS codes to describe the services rendered in their claims for reimbursement to health care benefit programs.

28.    Health care benefit programs, including Medicare, use these codes to understand and evaluate claims submitted by providers and to decide whether to issue or deny payment. Each health care benefit program establishes a fee or reimbursement level for each service described by a CPT or HCPCS code.

29.    Health care providers often seek reimbursement from insurance carriers on CMS Form 1500. On the form, the provider identifies itself by its Provider Identification Number ("PIN") or Tax Identification Number ("TIN"), identifies the beneficiary who received the services, describes the illness or injury

that makes the services medically necessary, and identifies the services provided by CPT and HCPCS codes. The insurance carrier will issue a payment or denial in response to the information contained in each CMS Form 1500.

30.     The Medicare Claims Processing Manual issued by CMS, is publicly available, and offers day-to-day operating instructions, policies, and procedures based on statutes and regulations, guidelines, models, and directives for Medicare Part B.

**Nurse Practitioner/Social Worker – Psychotherapy/E&M Services**

31.     Medicare recognizes the following professionals as eligible under Part B to furnish diagnostic and/or therapeutic treatment for mental disorders: physicians; clinical psychologists; clinical social workers ("CSWs"); clinical nurse specialists; NPs; PAs; certified nurse-midwives; and independently practicing psychologists.

32.     Medicare Part B will cover services furnished by NPs and CSWs for the diagnosis and treatment of mental illness that these medical professionals are legally authorized to perform under State law (*see generally* 42 C.F.R. § 410.73-410.76). In addition to being licensed in the state where the services are performed, CSWs are required to hold a Doctoral or Master's degree in social work and to have performed at least two years of supervised clinical social work.

11

33.    Medicare reimburses claims associated with CSW services at 75% of the amount a physician is paid under the Medicare Physician Fee Schedule ("PFS"), while NP services are paid at 85% of the amount a physician is paid under the PFS.

34.    Local Coverage Determinations ("LCDs") are defined in Section 1869(f)(2)(B) of the Social Security Act. This section states: "For purposes of this section, the term 'local coverage determination' means a determination by a fiscal intermediary or a carrier under Part A or Part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary or carrier-wide basis under such parts, in accordance with Section 1862(a)(1)(A)."  LCDs are created by the MACs.

35.    LCD L34616, titled "Psychiatry and Psychological Services," became effective October 1, 2015, and applies to the primary geographical jurisdiction of Michigan. LCD L34616 specifies that Medicare coverage of psychotherapy does not include teaching grooming skills, monitoring activities of daily living, recreational therapy (dance, art, play), or social interaction. It also does not include oversight activities such as house or financial management.

36.    LCD L34616 also states that psychotherapy services are not covered when documentation indicates that senile dementia has produced a severe enough cognitive defect to prevent psychotherapy from being effective.

37.   LCD L34616 specifies the expected period of time a provider will spend with a patient and/or the patient's family during psychotherapy sessions. Required time periods for CPTs at issue in this investigation are identified in the definitions below. Providers must not bill for psychotherapy of less than 16 minutes.

    a.  CPT 90832 – Psychotherapy; 30 minutes

    b.  CPT 90834 – Psychotherapy; 45 minutes

    c.  CPT 90837 – Psychotherapy; 60 minutes.

38.   According to LCD L34616, some psychiatry services may be reported with evaluation and management (E/M) services when performed. An E/M code may be used to report evaluation and management services alone or used to report an E/M service with psychotherapy. When reporting E/M services plus a psychotherapy add-on code, the following CPT Codes are used for psychotherapy:

    a.  CPT 90833 – Psychotherapy; 30 minutes

    b.  CPT 90836 – Psychotherapy; 45 minutes

    c.  CPT 90838 – Psychotherapy; 60 minutes.

39.   An E/M service is based on the licensed medical professional's work and includes services medically necessary to evaluate and treat the patient. To report both E/M and psychotherapy, the two services must be significant and separately

identifiable. LCD L34616 notes that the time associated with activities used to meet criteria for the E/M service is not included in the time used for reporting the psychotherapy service (i.e., time spent on history, examination, and medical decision making when used for the E/M services is not psychotherapy time.)

## PROBABLE CAUSE

### A. Medicare/State of Michigan/Banking Information

40.     According to Medicare enrollment forms, JUDD is listed as the sole owner, managing employee, and authorized official for LTS and his business practice location is listed as 43171 Dalcoma Drive, Suite 7, Clinton Township, Michigan.   JUDD is also listed as the contact person on the Electronic Funds Transfer Authorization Agreement, providing authorization for Medicare payments to LTS.

41.     Medicare certified LTS as a Medicare provider and issued LTS the group Provider Transaction Access Number MI8368, which became effective on or about February 1, 2015.

42.     The Electronic Data Interchange (EDI) dated November 16, 2015, authorizing the submission of electronic claims on behalf of LTS, contains JUDD's signature, who is listed as the "owner" of LTS.  JUDD certified that LTS would only submit claims to Medicare that are accurate, complete, and truthful. As recently as

March 12, 2020, LTS's biller, Carla Chaudoin, re-certified to Medicare that LTS would comply with all Medicare rules and regulations. The address of LTS was identified on the EDI as 43171 Dalcoma Drive, Suite 7, Clinton Township, Michigan.

43.    LTS's Medicare documents identify JUDD as a provider with an assigned provider number. Records from LARA show that JUDD is a psychiatric/mental health NP with an active license.

44.    LTS's Medicare documents identify Ebony Harvey-Jackson as a provider with an assigned provider number. In addition, Harvey-Jackson's provider number was assigned to two other businesses, Peaceful Hearts Adult Day Treatment, LLC (PHADT) and Peaceful Hearts Adult Daycare2, LLC (PHADC2). Records from LARA show that Harvey-Jackson is a Licensed Master Social Worker (LMSW) with an active license. Therefore, Harvey-Jackson possesses the qualifications required by Medicare to perform and bill for psychotherapy services.

45.     LTS's Medicare documents identify Sandra Hembree as a provider with an assigned provider number. A check of the LARA website indicates Hembree is an NP with an active license, and is therefore qualified to perform and bill Medicare for psychotherapy services.

46.    LTS's Medicare documents identify Eriko Usui as a provider with an

assigned provider number. A check of the LARA website indicates Usui is a limited license Master's level social worker whose license expired on April 30, 2020. By having only a limited license, Usui does not possess the qualifications required by Medicare to perform and bill for psychotherapy services.

47.     JUDD is the only signatory on the bank account ending in 1812 where Medicare payments to LTS are deposited. The name on the account is Life Transition Services, LLC, and the address is identified as 21031 Sunnydale St., St. Clair Shores, Michigan. I have reviewed LTS's bank records and observed electronic deposits from Medicare into the account ending 1812.

*Other LTS Employees*

48.     LTS's Medicare documents do not identify LaWanda Felton ("Felton") as a provider with an assigned provider number. Records from LARA show that Felton is a limited license bachelor's level social worker, with a license that expired on April 30, 2021. In Michigan, limited license bachelor's social workers are prohibited from practicing psychotherapy (Mich. Comp. Laws Serv. § 333.18501(4)). Therefore, Felton does not meet Medicare's requirements to provide and bill for psychotherapy services.

49.     LTS's Medicare documents do not identify Lakeyia Payne ("Payne") as a provider with an assigned provider number. In addition, according to public

databases, Payne does not have a national provider identifier ("NPI") number, which is a unique identification number for covered health care providers that is used in the course of administrative and financial transactions adopted under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Records from LARA show that Payne has a Professional Counselor-Education Limited License, which was scheduled to expire May 31, 2021. The State of Michigan defines a limited license counselor as an individual who has been granted a limited license by the Michigan Board of Counseling to offer counseling services under the supervision of a licensed professional counselor (LPC). Therefore, Payne does not meet Medicare's requirements to provide and bill for psychotherapy services.

50.    On February 10, 2021, agents obtained a search warrant, signed by Magistrate Judge Kimberly G. Altman in the Eastern District of Michigan, for LTS's electronic medical records (EMR) held by Therapy Notes, an electronic medical records company. Among the documents received in connection with this search warrant were spreadsheets with the names of other former LTS employees (e.g., Karen Warmbold) whose provider numbers were not assigned to LTS. A search of LARA's licensing website indicates most of these former LTS employees were licensed as either a PA, NP, LPC, or LMSW. Medicare requires that claims accurately identify the provider of any service.

17

**B. Medicare Claims Analysis**

51.    Medicare Part B data reveals that from January 1, 2015, through June 14, 2021, LTS submitted approximately $6,352,880 in claims to Medicare and was paid approximately $2,745,983 on those claims.

52.    The Medicare Part B data also indicates that LTS billed Medicare for an abnormally high number of services purportedly provided by JUDD, including numerous days over 24 hours of billable medical professional services. CoventBridge performed a time study of JUDD's NPI based on a number of timed CPT codes, including 99213 (established patient office or other outpatient visit, typically 15 minutes); 99214 (established patient office or other outpatient, visit typically 25 minutes); 99347 (established patient home visit, typically 15 minutes); 90792 (psychiatric diagnostic evaluation with medical services); and 90833 (psychotherapy, 30 minutes).  After reviewing JUDD's approved claims based on the "intra face time/hours," which are reserved for actual time spent with a patient, CoventBridge found JUDD billed 164 days over 23.99 hours between January 1, 2015, and November 17, 2020. Medicare paid JUDD $527,200.22 for the services associated with those claims. The following table illustrates some examples of such days:

| Service Date | Number of Patients | Intra Face Time/Hours billed to Medicare |
|:---:|:---:|:---:|
| 5/12/2018 | 58 | 45.17 |
| 11/10/2018 | 52 | 39.83 |
| 7/21/2018 | 52 | 39.75 |
| 3/23/2018 | 49 | 39.0 |
| 10/8/2017 | 51 | 38.50 |
| 6/23/2019 | 50 | 37.75 |
| 8/4/2018 | 49 | 37.67 |
| 7/8/2016 | 46 | 37.08 |
| 4/29/2017 | 49 | 36.83 |
| 9/8/2018 | 48 | 36.67 |
| 3/13/2020 | 48 | 36.50 |
| 4/26/2019 | 48 | 36.0 |

53.     Based on my training and experience investigating health care fraud, wire fraud, and other related federal offenses, billing for abnormally high volumes of service, including in excess of 24 hours of services purportedly provided in one day, is an indication of potential fraud. I reviewed a large sample of LTS's patient

progress notes, obtained via search warrant from Therapy Notes, associated with 35 of the highest billed (i.e., over 24 hours) dates by LTS. I also compared many of the patients' notes to the Medicare claims filed by LTS on those same days. I found multiple examples of the following: the progress notes did not exist in the patient files for the dates LTS billed the purported services to Medicare; the progress notes were written by ineligible or other providers but billed as having been rendered by JUDD; the progress notes failed to indicate services (e.g., psychotherapy sessions) that were, in fact, never rendered to patients but were nonetheless billed by LTS to Medicare; the progress notes indicated different patients were purportedly being seen by JUDD for individual sessions during the same blocks of time on the same dates; notes in the file indicated patients' appointments were cancelled or patients were not available but services were nonetheless billed by LTS to Medicare as having been rendered by JUDD; and the progress notes indicated 20-minute medication review visits by JUDD, marked on the notes as CPT code 99213, but LTS billed Medicare for an additional 30-minute psychotherapy service (CPT code 90833) on those dates.

### C. AdvanceMed Audit

54.    On approximately March 19, 2019, AdvanceMed initiated an investigation as a result of data analysis that identified JUDD as a provider who

billed psychotherapy add-on codes (i.e., 90833, 90836, or 90838) to nearly every evaluation and management (E/M) code (e.g., 99212, 99213, 99214, and 99347) he billed to Medicare. Since E/M codes plus psychotherapy add-on codes pay more than the corresponding stand-alone psychotherapy code (e.g., 90832, 90834, and 90837), consistently billing an E/M with a psychotherapy add-on is an indication of potential fraud.

55.     As part of this audit, AdvanceMed performed an onsite review of LTS on July 17, 2019, which included an interview with JUDD and a review of records and claims associated with eleven LTS patients, including Medicare beneficiary D.H. The medical review of these records resulted in a 100% denial rate due to billing for services not reasonable and necessary. The interview report identified JUDD's practice location and the site of the interview as 43171 Dalcoma Drive, Suite 7, Clinton Township, Michigan.

56.     Specifically, in the case of D.H., after reviewing JUDD's files, AdvanceMed concluded that on April 2, 2019, JUDD documented 18 minutes for his time of service with D.H. for psychotherapy and evaluation and management service.  JUDD did not delineate time for psychotherapy versus evaluation and management service. In addition, JUDD noted that D.H. could not stay focused on JUDD or the topic of the session without staff intervention to redirect. AdvanceMed

noted in their denial of the claim that JUDD did not provide any documentation to support that D.H. had the mental capacity to participate and benefit from psychotherapy services in a meaningful way.

57.    JUDD billed Medicare for two claims associated with D.H. on April 2, 2019, one claim for 30-minute psychotherapy (CPT code 90833) and one claim for established patient office or other outpatient visit, typically 15 minutes (CPT code 99213). JUDD billed Medicare $180 for these two claims and was paid $99.44.

**D. Witness Interviews**

**1.  Medicare Beneficiaries**

**A. *D.H.***

58.    On or about October 5, 2020, I interviewed S.S., child of D.H. (the same patient who is cited in paragraphs 55-57). S.S. confirmed his/her parent (D.H.) had stayed at a long-term facility in Richmond, Michigan, until his/her death on April 26, 2020. S.S. oversaw D.H.'s medical care, and all medical decisions had to be approved by S.S. regarding any services D.H. received.

59.    S.S. was not aware of any long-time providers D.H. had seen between 2017 and his/her death, aside from a visiting physician and a podiatrist. S.S. was not aware of D.H. receiving any psychotherapy services, and S.S. did not recognize JUDD's name. S.S. had not been contacted about, and S.S. had not approved of,

D.H. receiving any psychotherapy services. S.S. is a counselor by profession, and stated he/she would have been interested and involved in any psychotherapy services for D.H. if S.S. had been aware of them.

60.     S.S. stated D.H. was diagnosed with dementia, and by 2019 D.H. was having a hard time communicating, so psychotherapy services would have been very difficult to render. Also, D.H. was in hospice during the last couple of weeks of his/her life.

61.     Medicare claims data indicates that LTS billed Medicare $6,520.00 and was paid approximately $3,019.05, in connection with claims for 33 dates of service purportedly provided to D.H. by JUDD between October 26, 2017, and April 17, 2020. These claims include 32 dates where LTS billed the 30-minute psychotherapy add-on code (90833) plus E/M codes (99213 or 99347).

62.     During the period of January 30, 2019, through April 17, 2020, when S.S. said D.H. was having a hard time communicating because of dementia, Medicare claims data shows LTS billed Medicare $3,620, and was paid approximately $1,504.84, in connection with claims for 17 dates of service purportedly provided to D.H. by JUDD. On all 17 dates of service, LTS billed a psychotherapy add-on code (90833) to every E/M code (99213 or 99347) billed on those days.

63. Medicare claims data also confirms D.H. was receiving hospice services beginning April 7, 2020, until D.H. died on April 26, 2020. During this period, Medicare claims data shows LTS billed Medicare $640, and was paid approximately $37.74, in connection with claims for two dates of service purportedly provided to D.H. by JUDD. In both instances, LTS billed a 30-minute psychotherapy add-on code (90833) to each E/M code (99213 or 99347) billed on those two days.

## B. *S.O.*

64. On or about June 17, 2020, Medicare beneficiary S.O., who resides in the metro Detroit area, told federal agents s/he previously resided at St. Joseph Manor ("St. Joseph") at 4800 Cadieux, Detroit, for 12 years. S.O. left St. Joseph in April 2018.

65. While at St. Joseph, JUDD took over as psychiatrist for the residents from the former psychiatrist, Dr. Thabolingam, who had retired. S.O. had been seen and prescribed medications by Dr. Thabolingam.[1]

66. S.O. only saw JUDD on one occasion, when s/he shared an elevator with JUDD at St. Joseph. S.O. never met with JUDD for any psychotherapy or to

---

[1] According the Medicare Part B claims data, the first claim that JUDD submitted involving S.O. was for services purportedly provided on February 22, 2018. That claim was submitted on September 26, 2018 and denied (reason for denial was "correction to billing/payment error.") The first paid claim was submitted on September 27, 2018 for services purportedly provided on March 13, 2018.

receive any other services.

67.    S.O. also saw women that s/he believed to be social workers who worked for JUDD talking to residents in the lobby or recreation room at St. Joseph once a week. S.O. never met with any of these women and did not receive any psychotherapy services from them.

68.    After S.O. moved out of St. Joseph, S.O. saw on his/her Medicare Explanation of Benefits forms that JUDD had billed for purportedly providing psychotherapy services to S.O. that S.O. never received. S.O. reported the fraudulent billing to Medicare. S.O. also called JUDD's office after continuing to see his billing on his/her Medicare forms. S.O. spoke with JUDD and asked why he was billing Medicare when he had not been seeing S.O. JUDD responded, "yeah, yeah, I know, okay," and said he would fix the billing. S.O. described JUDD's tone as nervous. I reviewed the Medicare claims data and observed that JUDD submitted 31 claims for services purportedly provided to S.O., including 12 claims for 45-minute psychotherapy sessions (CPT 90834) purportedly provided by JUDD between approximately April 23, 2018 and June 19, 2018.

69.    S.O. was also concerned because if his/her Medicare number was misused, then other residents at St. Joseph may have had the same experience. S.O. described many of the residents of St. Joseph as "out of it," and stated they would

25

not be in a position to talk to or recognize JUDD because many of them had dementia, Alzheimer's, or severe psychiatric problems and could not communicate.

70.     Medicare claims data indicates that LTS billed Medicare $5,460.00 and was paid approximately $558.75 in connection with claims for services purportedly provided to S.O. by JUDD.

## 2. Former Employees

### A. *Ebony Harvey-Jackson*

71.     On December 8, 2020, and again on January 12, 2021, Ebony Harvey-Jackson was interviewed by agents. Harvey-Jackson was indicted on September 23, 2020, in the Eastern District of Michigan on one count of Title 18, U.S.C. 1349 (Conspiracy to Commit Health Care Fraud), and four counts of Title 18, U.S.C. 1347 (Health Care Fraud) in connection with fraudulent billing submitted through her employment at PHADT and PHADC2. Harvey-Jackson subsequently pleaded guilty on June 17, 2021, to one count of Title 18, U.S.C. 1349.

72.     Harvey-Jackson stated she worked for JUDD's company, LTS, for about one year, beginning in approximately March 2018. JUDD knew Harvey-Jackson because JUDD was also seeing clients at PHADT, the facility where Harvey-Jackson worked. JUDD had been hired by PHADT to visit the facility approximately once a month to see PHADT clients.  JUDD hired Harvey-Jackson,

Payne, and Felton from PHADT to assist with patients at St. Joseph on behalf of LTS.

73.    While working full-time at PHADT, Harvey-Jackson also purportedly provided psychotherapy to patients three times a week at St. Joseph for LTS. At first, Harvey-Jackson had three or four patients, and later her LTS patient base grew to eight. Harvey-Jackson never worked for LTS more than three days a week, she did not see more than eight clients each day, she never provided services to the clients at St. Joseph on weekends, and she did not give JUDD permission to bill her NPI for services she did not perform, for example, when she was out of town. Harvey-Jackson stated that Payne worked at St. Joseph three days a week as well.

74.    Harvey-Jackson did not know about JUDD or LTS's billing practices, but she assumed he billed her visits as 45-minute psychotherapy sessions. Harvey-Jackson admitted she often spent less than 30 minutes, and sometimes only 15 minutes, with the LTS patients.

75.    When hired at LTS, Harvey-Jackson filled out Medicare paperwork to assign her NPI benefits to LTS. Payne does not have an NPI, so LTS would not have been able to bill Payne's services unless they were billed under someone else's NPI. Harvey-Jackson assumed JUDD billed Payne's sessions under Harvey-Jackson's NPI.

76.     Harvey-Jackson stated JUDD used EMR maintained through Therapy Notes for the LTS patients. Harvey-Jackson shared her computer access to Therapy Notes with Payne so Payne could type up her own progress notes for the patients she had seen at St. Joseph.

77.     A review of the Medicare claims from March 2018 through March 2019 shows LTS billed Medicare $16,605 for 120 individual 45-minute psychotherapy sessions (CPT code 90834) purportedly provided by Harvey-Jackson on Saturdays alone, when, in fact, Harvey-Jackson did not work on any Saturdays. LTS was paid $6,492.78 for these claims.

### B. *LaWanda Felton*

78.     On June 26, 2020, and again on January 28, 2021, agents interviewed LaWanda Felton. While working together at PHADT, JUDD approached Felton about providing individual psychotherapy sessions to patients at a home in Detroit called St. Joseph. Because of a Medicare audit performed at PHADT, Felton was aware that Medicare and the State of Michigan permitted only Master's level licensed social workers to provide psychotherapy services to patients. Felton told JUDD that she was only a limited license bachelor's level social worker and could not render those services. JUDD told Felton that he would bill the services Felton rendered regardless. He also said he would pay her half of what he was reimbursed

by Medicare for the patient services she provided. Felton agreed to the arrangement.

79.     Felton worked for JUDD's business, LTS, from about March 2018 to about March 2019. JUDD's office staff gave Felton a list of clients at St. Joseph to see, and Felton provided individual psychotherapy to up to 12 clients at St. Joseph. About 50 percent of her sessions with these clients lasted 35-40 minutes, and the rest of her sessions lasted less than that. Some of her sessions lasted only 15 minutes because the clients were not interested in talking to her. JUDD never participated in or attended the individual psychotherapy sessions she led with the clients at St. Joseph.

80.     Felton did not provide JUDD with an NPI. She assumed her services were billed under JUDD's NPI because he said he would bill the services Felton provided.

81.     Felton provided to agents copies of Medicare Remittance Advices (RAs) she had received from LTS's staff. RAs are documents listing the claims paid by Medicare to a provider. The LTS staff marked the initials "LF" next to the patients Felton had seen. Felton advised agents she was paid for seeing these patients. A review of the Medicare claims shows LTS billed Medicare approximately $58,265 for approximately 375 services under JUDD's NPI, consisting of psychotherapy of various time increments, associated with the names marked with Felton's initials on

the RAs. LTS was paid $18,978.39 for these claims.

## C. *Sandra Hembree*

82.     Agents interviewed Sandra Hembree on March 1, 2021, August 6, 2021, and again on August 30, 2021. She reported that she is an NP specializing in mental health who worked for LTS from December 2019 to March 2020. Her job was to visit patients in group homes and perform reviews of the patients' medications. These medication review visits with each patient lasted about 10 to 15 minutes.

83.     Hembree did not render any psychotherapy services to any of the LTS patients she saw, and she has never done psychotherapy for patients in her professional experience. Her position was strictly limited to performing medication reviews for patients, and she only documented medication reviews in LTS's EMR associated with these visits. JUDD told Hembree he hired social workers to do psychotherapy sessions with patients.

84.     When JUDD first hired Hembree, JUDD said she could make more money by doing psychotherapy visits with patients. Hembree declined because of the time commitment involved in rendering psychotherapy sessions, in addition to medication reviews.

85.     A review of the Medicare claims from December 2019 through March

2020 shows LTS billed Medicare $18,560 for 163 individual 30-minute psychotherapy sessions (CPT code 90833) purportedly provided by Hembree, when she, in fact, did not perform any psychotherapy to the LTS patients. LTS was paid $6,155.79 for these claims.

86.     Hembree also advised she did not work for JUDD in March 2019. A review of Medicare claims from March 2019 shows LTS billed Medicare $360 for two 30-minute psychotherapy sessions (CPT code 90833) and two 15-minute patient visits (CPT code 99213) purportedly rendered by Hembree to two patients. LTS was paid $198.88 for these claims.

87.     Hembree confirmed LTS's office was located at 43171 Dalcoma Drive, Suite 7, in Clinton Township, Michigan. She estimated LTS had about four or five computers for staff to use, including one at JUDD's desk. Hembree would drop off or e-mail to LTS the lists of patients she saw for medication reviews. Hembree also saw patients holding completed one-page medical histories when she came to the LTS office.

### D. *Eriko Usui*

88.     On March 1, 2021, agents interviewed Eriko Usui, who is a limited license Master's level social worker. Usui never pursued her full licensure as an LMSW because she encountered health problems. JUDD hired Usui to do

psychotherapy with the LTS patients from March 2017 until July 2017. She worked for JUDD because he allowed her to work part time and make her own schedule.

89.     When JUDD hired Usui, she explained to him that she was only a limited license MSW and she needed to complete her supervised hours in order to become fully licensed. Usui knew she needed supervision hours because she had contacted the State of Michigan to find out how many supervised hours she needed and who could supervise her. After contacting the State, Usui learned she needed her hours to be supervised by an LMSW, not an NP. Since JUDD was an NP, she told him about the requirement to be supervised by an LMSW. JUDD told Usui he was going to be bringing an LMSW on board to supervise her, but he never did. JUDD also told Usui that he could bill for her services because he would be hiring an LMSW to supervise her sessions, even though he never did.

90.     A review of Medicare claims from March 2017 to March 2018 shows LTS billed Medicare $28,285 for approximately 300 services provided by Usui; LTS was paid $9,061.06 for these claims. These claims include services purportedly performed by Usui in March 2018 after she had already left LTS.

### E. *Karen Warmbold*

91.     On August 12, 2021, agents interviewed Karen Warmbold. She is a PA who worked for JUDD at LTS from about July 2017 until about June 2018.

Warmbold worked part-time for JUDD, about two to three days a week, mainly seeing patients in group homes. Before working at LTS, Warmbold shadowed JUDD to observe his practice.

92.   Warmbold was hired to perform medication reviews of LTS's patients. The medication reviews involved evaluating the patients' physical and mental health, reviewing the patients' medications, and handling refills if they were needed. These visits with each patient lasted 20 to 30 minutes.

93.   JUDD never discussed with Warmbold how LTS was billing her services. She did not know whether JUDD billed her services under the LTS NPI or her own NPI.

94.   Warmbold advised she did not perform any psychotherapy services for any of the LTS patients she met. She stated that if LTS billed for her having rendered any psychotherapy, those claims would be fraudulent.

95.   Warmbold understood JUDD to perform medication reviews of his LTS patients. She did not see him do any psychotherapy with any of the LTS patients during the approximately two weeks she shadowed him before working at LTS.

96.   Although LTS had an EMR system through Therapy Notes, Warmbold did not use the EMR. Instead, Warmbold maintained paper records of the visits with her LTS patients. She would give her handwritten visit notes to LTS employees, who

may have scanned and uploaded them to the EMR.

97.     A review of progress notes obtained from Therapy Notes associated with Warmbold's patients and compared with the LTS Medicare billing for those same patients, revealed Warmbold's services were all billed under JUDD's NPI. In 2017, LTS billed Medicare $30,580 for over 300 services rendered by Warmbold but billed as having been provided by JUDD; LTS was paid $15,153.08 for these claims. Further, during 2017 alone, Medicare data shows LTS billed $15,255 and was paid $7,998.80 for psychotherapy services associated with these same claims, which Warmbold stated she never performed.

## F. *Shelley Bush*

98.     On August 18 and August 24, 2021, agents interviewed Shelley Bush, owner of DMB Medical Billing (DMB) and former biller for LTS from approximately 2012 to approximately 2019. Bush confirmed the owner of LTS was JUDD.

99.     LTS prepared billing sheets that the LTS staff sent to DMB by fax or e-mail. The billing sheets included the name of the provider who rendered the services, the date of the services, the beneficiaries who received the services, the time block the services were rendered, and the CPT code(s) associated with the services. DMB used this information to prepare the claims submitted to Medicare on

LTS's behalf. Bush advised DMB never selected the CPT codes for LTS. After the claims were paid by Medicare, DMB would fax the Explanation of Benefits forms to LTS so JUDD could see which claims were paid.

100.    Bush stated that DMB and LTS exchanged e-mails daily. The types of documents typically exchanged via e-mail were billing sheets, Explanation of Benefits forms, and providers' schedules.

101.    Bush recalled an occasion when LTS submitted information that reflected JUDD saw 20 patients in a day, and LTS attached the CPT code 90837, which is associated with 60-minute psychotherapy, to those 20 patients. Bush confronted JUDD about this billing because she believed it was not possible to render all those services to patients in one day. JUDD said he must have put in the wrong CPT code, and he instructed Bush to change the code to one that was associated with a shorter amount of time. Bush declined; she told him that he would have to change the code himself and re-submit the information to DMB. Bush had similar conversations with JUDD on a couple of occasions.

102.    Bush provided agents numerous documents in response to a federal grand jury subpoena requesting records related to DMB's billing for LTS. Among those documents was a letter from JUDD notifying Bush that LTS was terminating DMB's billing services. The letter was dated February 25, 2020, and the letterhead

cited LTS's address as 43171 Dalcoma Drive, Suite 7, Clinton Township, Michigan.

### E. Review of Digital Evidence

103.    On July 26, 2020, federal agents executed search warrants at PHADT and PHADC2. Federal agents seized digital evidence from the two facilities in the course of executing the search warrants.

104.    In a review of the digital evidence from PHADT and PHADC2, agents found Word documents titled "Ebony LT timesheets" that listed the names of LTS patients and the dates of Monday, December 3, 2018, through Saturday, December 8, 2018. Each list had eleven LTS patients named.

105.    A comparison of these timesheets to the Medicare claims data shows LTS billed all of the named patients on the six dates of service (December 3, 2018 – December 8, 2018) under JUDD's NPI, rather than Harvey-Jackson's NPI. Specifically, LTS billed Medicare $8,505.00 for 62 claims of service for 45-minute psychotherapy (CPT code 90834), and LTS was paid $3,672.27.

106.    Medicare claims are reimbursed at different rates when performed by an NP (i.e., JUDD) versus an LMSW/CSW (i.e., Harvey-Jackson). As a result, in 2018, Medicare reimbursed JUDD's NP services for CPT code 90834 at $58.29 per claim, while Medicare would have reimbursed those same 62 claims at $53.01 per claim if rendered by an LMSW/CSW. By submitting the claims cited in paragraph

104 under JUDD's NPI rather than Harvey-Jackson's NPI, LTS was paid an additional $332.64.

107.    Further review of the digital evidence revealed a Word document titled "LT Weekly PN (Lakeyia Payne)[6358]." The document includes "Weekly Progress Notes" for a Medicare beneficiary named G.G. dated October 17, 2018. A review of Medicare claims data for G.G. on that date shows LTS billed Medicare $135 and was paid $58.29 for one claim of 45-minute psychotherapy (CPT Code 90834), purportedly rendered by JUDD.

### F. Medicare Billing While Traveling

108.    In June 2020, agents received travel records for JUDD from American Airlines in response to a federal grand jury subpoena. The records indicated that JUDD traveled to Dallas on November 30, 2018, and returned to Detroit the night of December 1, 2018.

109.    A comparison of the travel records to the Medicare claims shows LTS billed Medicare $5,915 for 56 claims, which included 18 patients billed for 45-minute psychotherapy (CPT code 90834), as well as 19 patients billed for the 30-minute psychotherapy add-on code (90833) plus an E/M code (99213), purportedly provided by JUDD on December 1, 2018, when he was outside the State of Michigan. LTS was paid $2,771.68 for those claims.

110.   In addition, JUDD's personal financial records were obtained from Huntington Bank in response to a federal grand jury subpoena. The records identified multiple purchases of, for example, assorted leisure and entertainment activities in South Carolina between September 19, 2017, and October 2, 2017. JUDD's financial records show purchases and charges in South Carolina during approximately this same time frame in 2018, 2019, and 2020 as well. JUDD's visits to South Carolina during these years were also corroborated by travel records obtained from Delta Airlines.

111.   A comparison of the financial records, which indicated travel to South Carolina from September 16 through September 30, 2017, to the Medicare claims data shows LTS billed Medicare $14,235 for 138 claims of services purportedly provided by JUDD on dates the records show he was outside the State of Michigan. LTS was paid $6,503.06 for those claims. In addition, when comparing JUDD's travel in 2018, 2019, 2020, to the Medicare claims, the data shows LTS billed Medicare $65,350 for 570 claims of services purportedly provided by JUDD on dates records show he was outside of the State of Michigan. LTS was paid $31,301.49 for those claims.

112.   In approximately April 2020, agents received travel records for Harvey-Jackson from Delta Airlines. The records indicated dates and locations of travel for

Harvey-Jackson, including travel from Detroit on December 25, 2018, to Las Vegas, and a return flight from Los Angeles to Detroit on January 3, 2019.

113.   A comparison of those travel records to the Medicare claims shows LTS billed Medicare $8,910 for 64 individual 45-minute psychotherapy sessions (CPT code 90834) purportedly provided by Harvey-Jackson on dates she was outside of the State of Michigan. LTS was paid $3,465.54 for these claims.

## IDENTIFICATION OF LOCATION TO BE SEARCHED

114.   This affidavit is made in support of an application for a warrant to search the business known as LTS operating at 43171 Dalcoma Drive, Suite 7, Clinton Township, Michigan (Subject Premises). Based on my investigation, knowledge, training, and experience, I know that medical providers store and maintain documents related to their patients and their medical practice and that these documents can include, but are not limited to, billing and patient communications, treatment plans, progress notes, medical charts, documents reflecting diagnoses, patient bills, receipts of paid bills and claims for reimbursement, and other business and financial documents. I seek to seize any and all such documents and records (in whatever form stored – hard copy or by electronic media).

115.   According to interviews, Medicare records, and LTS's website, the current business address of LTS is 43171 Dalcoma Drive, Suite 7, Clinton Township,

Michigan. The office location of LTS, at 43171 Dalcoma Drive, contains a business sign reading "Suite 7, Life Transition Services, Psychiatric Urgent Care, David Judd, M.S.N. PMHNP-BC" next to the entrance of the business.

116.   According to Medicare enrollment records, patient records for LTS are stored at 43171 Dalcoma Drive, Suite 7, Clinton Township, Michigan, the Subject Premises. The business submitted claims and was paid for psychotherapy services as recently as August 2021.

## REQUEST TO SEIZE COMPUTERS AND RECORDS

117.   Based on my training and experience, business offices rely upon computers to create and store data, including billing data. It is likely that the provider's insurance billing and patient records, documents, and materials will be found stored on computers in their respective offices. During interviews with former employees, it was revealed that LTS utilized EMR and computers to maintain patients' files.

118.   For the reasons stated above, there is probable cause to believe that one or more computers in the offices at the Subject Premises were used to generate false billings and contain information including records, documents, and materials relating to these crimes.

119.   Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (Computer Personnel) will access any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data.

120.   If the Computer Personnel determine that the data reviewed does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time from the date of seizure unless further authorization is obtained from the court.

121.   Authority is sought to search any computer hardware or computer related equipment capable of creating and/or storing information in electronic or magnetic form.  Computer related equipment includes, but is not limited to, central processing unit(s), and/or peripheral equipment used to facilitate the creation, transmission, encoding or storage of information. Agents seek the authority to search for any or all information and/or data stored in the form of magnetic or electronic encoding on computer media, or on media capable of being read by a computer, or with the aid of computer-related equipment.  This media includes, but is not limited to, floppy disk(s), fixed hard disk(s), removable hard disk cartridge(s), tape(s), laser disk(s), videocassette(s), CD-ROM(s), zip disk(s), smart card(s), memory stick(s),

memory calculator(s), PDA(s), and/or other media that are capable of storing magnetic coding.

122. If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system(s) utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment. If the agent determines the material found on the premises is too voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized. Authority is sought to seize software, documentation and instruction manuals, operating logs and manuals, utility programs, compilers, interpreters, cabling and connectors, or any other equipment, programs, or software used to facilitate direct or indirect communication with the computer hardware and/or software.

123. In most cases, a thorough search of the premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic

picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

124. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, authority is sought to seize or image storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

125. Medicare providers are required by law to maintain all records that disclose the extent of services provided and significant business transactions for a period of at least six years. Based upon my experience investigating health care fraud, I have learned that Medicare providers typically maintain their records at their place of business.

## **CONCLUSION**

126.   Based on the foregoing, this is probable cause to believe, and I do believe, that the Subject Premise, further described in Attachment A, will contain the items set forth in Attachment B, which constitute evidence, fruits of crime, contraband, and/or instrumentalities of the violations of Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1343 (Wire Fraud), Title 18, United States Code, and Section 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud).

## **REQUEST FOR SEALING**

127.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested applications, including the applications, affidavit, and search warrants.  I believe that sealing these documents are necessary because the items to be seized are relevant to an ongoing investigation into the described fraudulent scheme. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Special Agent Claudia M. Link
Federal Bureau of Investigation

Sworn to before me and signed in my
presence and/or by reliable electronic means.

Hon. David R. Grand
United States Magistrate Judge

Dated: September 14, 2021

45

**ATTACHMENT A**

**<u>PREMISES TO BE SEARCHED</u>**

**Subject Premises** – Life Transition Services, LLC, 43171 Dalcoma Drive, Suite 7, Clinton Township, Michigan 48038

43171 Dalcoma Drive, Clinton Township, Michigan 48038, is a stand-alone commercial business building. The building is a single-story, brown brick structure. The premises is located in Suite 7, which is identified on the business directory located in the lobby of the building. A sign is posted next to the door identifying Suite 7 as belonging to David JUDD and Life Transition Services.








## ATTACHMENT B

## ITEMS TO BE SEIZED

For the time period of February 1, 2015, to present, any and all of the following items concerning or related to any individual or entity, known or unknown, who is reasonably believed to be part of the scheme or a beneficiary of the scheme described in the affidavit.

This information may be stored or filed and includes any format in which the information may exist, including, without limitation, the media of hard copy, computer hard disc, digital storage devices, and computer discs:

1.  All records related in any way to patients of any of the above persons or businesses, including, without limitation, the following type of records: patient charts, files, records, insurance cards, licenses, identification cards, treatment cards, prescription records, patient ledger cards, patient complaints, patient sign-in sheets, appointment books, telephone logs, physician notes, nursing notes, medical assistant notes, social worker notes, original patient or referral source listings.

2.  All documents constituting, concerning, or relating to bills, invoices and claims for payment or reimbursement for services billed to insurance companies, including Medicare, for any patients.

3.  All financial and tax-related books, records and documents related in any way to the above persons or businesses, including, without limitation:

    a.  Bank accounts, money market accounts, checking accounts, equity line of credit, investment accounts, stock fund accounts, bonds or bond funds; including deposits and disbursements, canceled checks or drafts, electronic transfers, ledgers, loan statements, and loan agreements;

    b.  Credit/Automatic Teller Machine/Debit card accounts;

49

c.  All corporate, business, and personal tax returns, including, without limitation, any quarterly employment tax returns, withholding records, W-2s, and any Internal Revenue Service Form 1099s;

d.  All loan and credit information, including, without limitation, any letters of credit, revolving credit arrangements, loans, loan applications, financing arrangements, factoring arrangements, promissory notes, leases, or any other documents concerning sources of borrowed funds, including any applications;

e.  All information relating to the purchase, titling and insurance of vehicles, real estate and other assets, including safe deposit boxes and keys;

f.  All financial statements, accounts payable/receivable, and credit reports.

4.  Documentation of all patient appointments or scheduling and patient sign-in sheets.

5.  All documents consisting, concerning or relating to all current and former employees, including, without limitation, personnel files, employee rosters, names, addresses, telephone numbers, email addresses, time cards or similar records, expense reports, training information, certification verification, salary and compensation information, disciplinary records, licensure records, job applications, job descriptions, employment agreements and W-2 forms.

6.  All documents constituting, concerning or relating to work and personal diaries, calendars, logs, appointment books, and schedules.

7.  All documents related to the purchase, leasing, servicing or operation of any durable medical, physical therapy or other medical equipment.

8.  All records related to any payments made to patients or patient recruiters/marketers to induce patients to seek treatment from any of the above referenced individuals or business.

9.  All invoices and supporting documentation evidencing monies owed to or received from any of the above referenced individuals or business.

10. All contracts, billing agreements, professional services agreements, or any other contracts between the above referenced individuals or business, and any other individual, company, physician or billing company.

11. All Medicare handbooks, manuals, instruction materials, newsletters or other Medicare publications.

12. Records of control over other areas such as storage units where financial, medical or other billing records may be maintained.

13. Records of control of the premises and things described, namely, utility bills, telephone bills, rent or lease records pertaining to or evidencing ownership or control of the premises to be searched.

14. All retrievable information such as recorded telephone messages, and other electronically stored information and computer hardware, including, without limitation, floppy discs, compact discs or other data storage discs or tapes, thumb or flash drives.  Any electronic storage media, including, without limitation, cellular telephones, pagers, electronic organizers, and PDAs, which may be held for such reasonable time as necessary to determine whether it contains data within the ambit of this warrant.  Where data is found on a personal computer storage drive file, the agents executing this search warrant are authorized to seize, where necessary, the computer system's input/output or "I/O" devices, software, documentation, and data security devices.  When the computer analyst determines that these items are no longer necessary to retrieve and preserve that data evidence, they will be returned within a reasonable time.

15. Instructions, memoranda, passwords, and other information relating to, or required to facilitate the operation of any computer equipment which contains any of the aforesaid information.

16. Organizational or corporate papers filed with the appropriate state agencies and any amendments thereto, including, without limitation, articles of incorporation, by-laws and annual reports.

17.  All correspondence, including memoranda, letters, and electronic mailings (emails) concerning any of the records described in the previous paragraphs.

18.  Currency or other items of significant value reasonably believed to be proceeds, fruits or instrumentalities of the illegal activity described in the affidavit for this search warrant.

19.  Records related to assets or items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant.

\*\*\*

20.  Regarding records and information pertaining to the above stated offense which may be stored in digital form, law enforcement personnel executing this search warrant will employ the following procedure in searching for data capable of being read, stored or interpreted by a computer:

a.  Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether or not these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b.  If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the preservation of the data, then the computer personnel will determine whether it is practical to copy/image the data.

c.  If the computer personnel determine it is not practical to perform on-site searching, copying or imaging (due to time, technical or other considerations), then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and

seize any data that falls within the list of items to be seized set forth herein.

d. Any data storage device that is encrypted and unreadable will not be returned until law enforcement personnel have determined that it or its data do not constitute (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed property, or (5) items that fall within the list of items to be seized set forth within.

e. In searching the data, computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.

f. If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41 (b), the government will return these items within a reasonable period of time.

g. In order to search for data pertaining to the above stated offenses that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

    i. Any computer equipment and storage device capable of being used to commit or store evidence of the offenses listed above;

    ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including but not limited to word processing equipment, modems, docking stations, monitors, printer, plotters, encryption devices, and optical scanners;

    iii. Any magnetic, electronic or optical storage device capable of storing data such as floppy disks, fixed hard disk drives, external hard drives and enclosures, network attached storage units,

removable hard disk cartridges, tapes, laser disks, videocassettes, CD's, DVD's, zip disks, smart cards, memory sticks, memory calculators, PDA's, USB flash drives, printers and fax machines with memory buffers, PC cards, electronic dialers, electronic notebooks, mobile telephones, answering machines and/or other media that is capable of storing magnetic coding;

iv.   Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, or software;

v.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.   Any physical keys, encryption devices or similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data.

21.   The terms "records," "documents," "communications," and "applications," include all of the foregoing items of evidence in whatever form and by whatever means such records, documents, communications, applications, their drafts or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing or drawing with any implement, on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, videotapes, photocopies); any mechanical form (such as printing or typing); any electrical, electronic or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard drives, backup tapes, CD ROMs, optical discs, printer buffers, smart cards, memory calculators, or electronic notebooks, as well as printouts and readouts from any magnetic storage device).

AUSA:   Kathleen Cooperstein          Telephone:  (202) 957-2958
Special Agent:       Claudia Link          Telephone:  (313) 460-2087

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

In the Matter of the Search of          )
*(Briefly describe the property to be searched*          )
*or identify the person by name and address)*          )          Case No.  21-mc-50200-2
43171 DALCOMA DRIVE, SUITE 7,          )
CLINTON TOWNSHIP, MICHIGAN 48038          )
          )

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____ .
*(identify the person or describe the property to be searched and give its location):*

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B, violations of:
      18 U.S.C. § 1347  (Health Care Fraud)
      18 U.S.C. § 1343  (Wire Fraud)
      18 U.S.C. § 1349  (Conspiracy to Commit Health Care Fraud and Wire Fraud)

**YOU ARE COMMANDED** to execute this warrant on or before   September 27, 2021 _____   *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty  .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      September 14, 2021    10:17 am          _____
                                                                      *Judge's signature*

City and state:     Detroit, Michigan _____          David  R.  Grand    U.S. Magistrate Judge
                                                                      *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>21-mc-50200-2 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*